Filed 7/10/24  R.P. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| R.P.,<br><br>　　　Petitioner,<br><br>　　　　　v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>　　　Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>　　　Real Party in Interest. | F087822<br><br>(Super. Ct. No. 23CEJ300161-1)<br><br><br>**OPINION** |

## THE COURT*

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Kimberly J. Nystrom-Geist, Judge.

Laura M. Boyd for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

\*　　　Before Levy, Acting P. J., Franson, J. and DeSantos, J.

R.P. (mother) petitions this court for extraordinary writ review of a juvenile court order bypassing reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(4),[1] and setting a section 366.26 selection and implementation hearing for her two-year-old daughter, L.P.W.[2]  Mother contends the court erred in finding she did not prove by clear and convincing evidence that reunification was in L.P.W.'s best interest.  Finding no merit to mother's contention, we deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the department on June 13, 2023,[3] after mother's one-year-old son Li.W. (the baby) nearly drowned while bathing with his siblings, twin brother, Lu.W. (son) and 21-month-old L.P.W. (daughter), when mother stepped away from the bathroom.  Mother began CPR and emergency response personnel were able to revive the baby, who was hospitalized.  The baby was in critical condition, was on a ventilator, and had limited brain function.[4]  Police placed a protective hold on the children.

Mother and the children were living in a two-bedroom apartment with seven other people—mother's boyfriend, his two adult sons, and his four minor children who ranged in age from 10 to 15.  The adult sons were in the home when the drowning took place, and one of them told police that mother was outside talking to him in the car while the children were in the bathtub.  The apartment had a roach infestation, the floors were

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     Mother also filed a notice of appeal from the juvenile court's order bypassing reunification services under section 361.5, subdivision (b)(4) as to her now two-year-old son, Lu.W., which is pending under case No. F087821.  Since Lu.W.'s presumed father, Lo.W. (father), received reunification services as to him, a section 366.26 hearing was not set for Lu.W.  As L.P.W.'s alleged father, father did not receive reunification services as to her.

[3]     References to dates are to dates in 2023 unless otherwise stated.

[4]     The baby ultimately succumbed to his injuries on November 19.

2.

concrete as the carpet had been removed, there was only one bed in the home, and the toilet looked like it had not been cleaned for months. Mother told the social worker she bought marijuana from a dispensary and smoked two or three times a day outside to help with her " 'extreme anxiety.' " The marijuana and paraphernalia were kept in a box inside an ice chest on their back patio; mother denied that the children had access to it.

A dependency petition was filed on June 15, alleging the three children came within the provisions of section 300, subdivision (a) (serious physical harm), based on the baby's drowning and his siblings being at substantial risk of suffering serious physical harm inflicted nonaccidentally by mother, and subdivision (b)(1) (failure to protect), based on the baby's drowning, mother's marijuana use, and the unsanitary condition of the home. As to the baby only, it was alleged that he came within the provisions of section 300, subdivisions (e) (severe physical abuse) and (i) (cruelty). The children subsequently were ordered detained, and mother and father were offered parenting classes, evaluations and recommended treatment for substance abuse, mental health and domestic violence, and random drug testing.

***The Jurisdiction/Disposition Hearing***

A combined jurisdiction and disposition hearing was held on October 17 and 19, and November 6 and 16. At the outset of the October 17 hearing, the department asked the juvenile court to find jurisdiction as to all counts, and that the court deny mother reunification services under section 361.5, subdivision (b)(5) and (6).

Mother testified that on the date of the incident, she placed the children in the bathtub and started running the water. Mother said she was "foggy brained" and not thinking straight because she was sick with a sore throat and possible sinus infection. She realized she forgot the towels, so she left the bathroom to get them and when she returned, the baby was face down under the water. Mother said she pulled the baby out of the water and began CPR. Mother estimated it took her from two to five minutes to look for the towels.

3.

The 18-year-old son of mother's boyfriend, Ruben H., was the first one to discover the baby was under the water and unresponsive—while mother was looking for towels, he went into the bathroom and called for her, but he did not pick the baby up. When mother got there, she picked the baby up from the tub and took him to the living room to begin CPR. She sent Ruben to a neighbor's house to call 911. Mother denied she was outside when the children were in the bathtub and said Ruben told police she was outside because he was afraid that he would be in trouble for finding the baby. Mother did not tell the department that Ruben found the baby because she did not want to get him in trouble. The family shared this fear, so they decided not to discuss it. Mother accepted responsibility for the drowning and knew she was neglectful and failed as a parent, but she would not accept charges of nonaccidental neglect and abuse as she did not intend for the baby to drown.

Mother admitted marijuana use, but she denied using marijuana on the day of the incident and claimed the last time she smoked marijuana was the day before the incident. She had not seen a doctor about her marijuana use, but she was not addicted to it as she stopped immediately so she could get her children back. She spoke to her therapist and figured out healthier coping skills that she could use instead of smoking. Mother had spoken with a substance abuse specialist that the department referred her to and was told that she was not eligible for services.

Mother was attending a 14-week parenting class, which the department referred her to and where she learned stress management and self-care, and she was due to graduate soon. The class did not discuss safety of the children, but mother had done her own research to keep her children safe. Mother also was participating in weekly mental health therapy after receiving a referral from the department; her treatment goals included reducing her anxiety attacks and recovering from her own childhood trauma, as well as the trauma from the baby's drowning. Mother had started attending child abusers treatment and domestic violence programs.

4.

Dr. Victor Vargas, a pediatric intensivist in the pediatric critical care unit who cared for the baby, could not say how long the baby was underwater but he could say the baby's brain did not get enough oxygen for a significant time. Neither Vargas nor his colleagues believed the drowning was intentional.

The juvenile court found the department met its burden of proving the jurisdictional allegations under section 300, subdivision (b) by clear and convincing evidence, but the department failed to prove the allegations under section 300, subdivisions (a), (e), and (i). Based on the court's findings, the department conceded the reunification bypass provision of section 361.5, subdivision (b)(5) was inapplicable, but it still requested mother be denied services under section 361.5, subdivision (b)(6), as the court found the section 300, subdivision (b) count true by clear and convincing evidence. The court, however, found that section 361.5, subdivision (b)(6) did not apply, as the court could not find mother inflicted harm on the baby.

The juvenile court found mother's progress toward alleviating or mitigating the causes necessitating foster care placement was minimal. The court explained that while mother addressed this as something that happened in her life and she felt guilty, she participated in actively hiding information from the department by not revealing who found the baby and instructing people not to tell the department the truth. Moreover, participating in programs alone did not demonstrate she was addressing the causes necessitating foster care placement.

The juvenile court made the children dependents under section 300, subdivision (b), removed them from mother's home, granted mother twice-weekly one-hour supervised visits, and ordered reunification services for mother consisting of parenting classes, evaluations and any recommended treatment for domestic violence, substance abuse, and mental health, and random drug testing. The court directed the department to refer mother for another substance abuse assessment if she had a positive

5.

test or an unexcused no-show. The court also ordered a psychological evaluation and risk assessment of mother at the department's request.

### *The Subsequent Dependency Petition*

The baby passed away three days later, on November 19, after succumbing to his injuries from the drowning. On December 8, the department filed a subsequent dependency petition under section 342. The subsequent petition contained a single count under section 300, subdivision (f), which alleged mother caused the death of the baby, the sibling of daughter and son, as the baby nearly drowned when he was left unattended in the bathtub with his siblings, the baby succumbed to his injuries and passed away, and his injuries were not sustained ordinarily but instead as the result of unreasonable or neglectful acts of the person who had him in her care or custody.

A contested, combined jurisdiction and disposition hearing was held on March 22 and 25, 2024. The department provided an update on mother's services. Mother completed parenting classes. She had attended a substance use disorders orientation on July 7, and was found to not meet medical necessity for treatment. Mother enrolled in random drug testing on June 20 and tested positive 18 times from June 14 through August 25, had no shows on August 5 and October 18, and refused to test on November 9. Mother claimed she forgot to call on October 18 to see if she needed to test, and the November 9 test was marked as refused because she was unable to provide a large enough urine sample.

Mother attended a domestic violence inventory on July 3, and was recommended to complete the Phoenix program and the child abuse intervention program. Mother completed nine of 52 sessions of the child abuse classes, with one missed class, and had completed six of 26 sessions of the Phoenix program, missing two classes. Mother completed a mental health assessment on July 24, and was found to meet medical necessity for treatment and recommended to complete individual treatment and clinical case management. She was attending weekly sessions with a clinician.

The department initiated a referral for a psychological evaluation and risk assessment on November 20, which mother participated in on February 16, 2024. Mother discussed during the clinical interview how she was raised in the foster care system from ages nine to 18 after finding her mother dead. Her foster parents were caring for her children while they are in foster care. She reported receiving counseling for anxiety and trauma in 2015 but denied treatment with a psychiatrist or inpatient hospitalization.

When asked to explain the events leading to the children's removal, mother told the assessor that she was giving the children a bath and was getting a towel for them. She failed to unplug the drain and delegated her oldest stepson to watch the children while she looked for a towel, but he was wearing his headset and failed to listen to the children. When she returned with the towel, she found the baby unresponsive and attempted to resuscitate him. The assessor noted there appeared to be conflicting information regarding the events that preceded the baby's death. Mother appeared slightly defensive when asked why the stepson would fabricate his response to police that mother was outside talking to someone in a vehicle while under the influence of marijuana. Mother explained he did not want to appear neglectful caring for his younger siblings when he was responsible for them at the time.

The evaluation and assessment showed that mother appeared to have a chronic trauma history as a child and adult and may have limited insight and judgment as to how her previous trauma affected her parenting skills. It was recommended that mother be evaluated for the use of psychotropic medications to help with coping; participate in certain psychotherapy services to help process her past cumulative trauma; and participate in mental health treatment to provide additional tools to cope with her childhood trauma, discuss potential stressors in her life, and improve her insight and judgment. While mother had the capacity to use reunification services, she may need more direct communication about her lack of insight which could be a barrier to her parenting skills. If the children were returned to mother or unsupervised visits were

7.

ordered, the level of risk to the children was considered moderate to high based on mother's impaired insight and poor judgment, and difficulty acknowledging full responsibility for this matter. The report noted that mother had made progress in, and was actively engaged in, reunification services, which significantly decreased the potential risk of abuse of the children.

The department submitted on the reports and asked the juvenile court to find the section 300, subdivision (f) count in the section 342 petition true and deny mother reunification services pursuant to section 361.5, subdivision (b)(4).[5] Mother did not agree with the report and recommendation.

Mother testified about her participation in reunification services—she graduated from the parenting program and was participating in the child abuse program, the Phoenix program, random drug testing, and therapy. Mother's last positive drug test was on August 25, and her first negative test was on September 1. Mother was about halfway through the 52-week child abuse class. Mother had participated in more than 10 sessions with her current therapist and 10 to 15 sessions with her previous therapist.

Mother felt guilty about and responsible for the baby's death. Mother discussed these feelings with her therapist and was trying to move past thinking about what she should have done differently. Mother explained what she would do differently now—she would only bathe one baby at a time and have everything she needed in the bathroom. When mother was asked if she would ever leave a baby unattended in the bathtub, mother responded, "No." Mother did not believe the psychological assessment was accurate

---

[5]     The department recommended that father, the presumed father of son, who was a noncustodial parent, be denied placement of son and provided with family reunification services as to son. The department recommended that, as daughter's alleged father, father should not be provided family reunification services as to her, and the juvenile court should set a section 366.26 hearing as to daughter.

because she had coping skills to deal with her prior trauma, and she did not believe the trauma would affect her parenting.

Mother admitted she sometimes needed time away from the children to control her anxiety. Mother testified when she is triggered, she gets anxiety symptoms, such as being defensive, shaking, hyperventilating, and crying, but she did not believe the triggers interfered with her parenting. Mother believed the children should have been removed from her because she was neglectful by leaving the children in the bath unattended.

Mother believed the baby passed away because of his injuries and he declined more quickly due to the vaccinations he received. Mother did not recall telling the social workers that she believed he died due to the vaccines; instead, she thought she mentioned that the vaccines sped up his death process. Mother admitted she was responsible for the injuries that led to the baby's death. She may have stated that she did nothing wrong in the "very beginning, but after the initial mistake of leaving the children alone, [she] made [her] best efforts to save his life."

County counsel asked mother to explain what happened the day the baby drowned. Mother responded that she put the children in the bath, and she stayed for the duration of the bath. At the end of the bath, she left them there to grab a towel and as she was searching for one, Ruben went into the bathroom and yelled, "Mom," and she went in, and the baby was face down. Mother grabbed the baby, performed CPR, and told Ruben to call 911. Ruben was not supposed to be watching the children in the bathtub. Mother called him to look for the towel, but he could not hear her because he had a headset on, so she went to look for the towel herself.

The third-party supervisors of mother's visits are mother's friends who helped her a lot during the case. Mother was aware of reports that son was having nightmares after visiting her; mother said that after she was made aware of this, she asked for family therapy. Mother denied putting the children down for naps during her one-hour visits—

9.

twice son came to visits asleep so she laid him down so he could continue sleeping. Mother was aware that daughter did not want to get into the car to come to visits.

Mother was not seeing a psychiatrist. She was aware of the results of the psychological evaluation and while she was not opposed to seeing a psychiatrist, she did not think she needed one since she had seen one in the past. Mother believed she was stable enough to care for the children. Mother could not pinpoint when she became stable, but she was working on herself and was progressing through therapy and classes.

Deyse Raygoza, the social worker assigned to the case and who supervised some of mother's visits, had not seen mother behave inappropriately during visits. The third-party supervisors who had been supervising visits since September provided written reports of visits; there was nothing in those reports that would indicate the children are not safe with mother. The reports showed that visits tended to go well, mother interacted with the children, and there were no concerns. The children recognized she was their mother. Raygoza had observed the children were happy during visits and physically affectionate with mother, and they would go to her if she asked for a hug. Raygoza had not seen the children upset at the end of visits and had not seen mother put them down for a nap during a visit.

Raygoza believed the children were attached to mother, but she was not trained to assess the bond between a parent and child; instead, bonding assessments are performed by social worker practitioners in the adoption assessment unit. Raygoza also believed the children were attached to the care providers, as they sought them for comfort, and they were more affectionate or attached to the care providers than mother. Raygoza, however, admitted that she, along with her supervisor, assessed the bond between the children and mother when recommending a bypass of reunification services.

Nichole Castanon-Bletz, a social worker supervisor who supervised this case since it was assigned to Raygoza, had not seen a change in mother's behavior in her interactions with mother. The department's concern was mother's inability to understand

10.

how the situation came to be and her inability to verbalize what would be different. Mother had never told Castanon-Bletz that the children should have been removed or that she was an unsafe mom. At first mother believed the children had been removed due to the uncleanliness of the home; the department had to explain that was a small piece of the problem and the department was more concerned about the baby and her inability to provide protection for the children.

Castanon-Bletz knew the story mother provided to the assessor was a new one and that mother had provided multiple accounts of the incident. Honesty is important in assessing whether someone has benefited from services. Castanon-Bletz explained that "sitting in a service is not safety"; instead, it is demonstrating having benefited and learned from the service and the ability to show change. That mother's story had changed after all this time was a concern because they were not seeing the behavior change the department was looking for. Castanon-Bletz did not believe more services would result in mother being safely able to provide for the children by June 2024, as mother had been through services since detention. She believed there was still a risk to the children were they to be returned to mother's care, as the department was having a hard time understanding what would be different. The problem concerned mother's poor judgment placing the children at risk, rather than a specific incident in the bathroom.

Raygoza also testified she had not seen a change in mother's behavior and mother was unable to articulate what she learned through her participation in services. Whenever mother mentioned what she learned, it pertained to older children, not young children. Raygoza asked the children's care providers, who had been mother's foster parents and legal guardians since she entered foster care at age eight or nine until she turned 18, whether they had seen a change in mother; they told her they had not. Mother did not call and ask about the children and when the care providers dropped the children off for visits mother did not ask anything about them. The care providers were concerned mother would continue to be negligent and leave the children unattended. One time the

11.

care providers picked the children up early from a third-party visit and they noticed mother was on her phone while the children were playing alone. As far as changes in mother's behavior, Raygoza explained the department wanted to see her take responsibility for the actions that led to the baby's drowning and be able to explain how she would be able to keep the children safe were they returned to her care.

In closing argument, county counsel asked the juvenile court to find the section 300, subdivision (f) count in the section 342 petition true by clear and convincing evidence, as the department had proven the baby passed away due to mother's neglect. County counsel asserted the department had proven that mother should not be provided reunification services under section 361.5, subdivision (b)(4), as she caused the baby's death.

Anticipating arguments that it would be in the children's best interests to provide mother with family reunification services, county counsel argued it had not been shown by clear and convincing evidence that it would be in the children's best interests to provide mother with services. Mother had not made progress in treating her severe mental health issues, appeared to minimize her issues, and failed to show she benefited from her classes, as she gave vague answers about what she learned and showed lack of awareness or insight regarding her efforts. County counsel stated the death of another child is the most serious problem that could lead to dependency and set a high burden for the parent to receive reunification services. County counsel further argued there had been no showing that reunification services would likely succeed, as mother's changing stories about the incident showed her lack of insight and poor judgment that made reunification unlikely in the short timeframe available to mother. In addition, the children needed stability and continuity, as mother's lack of insight and poor judgment continued to be an issue.

Mother's counsel first addressed jurisdiction under section 300, subdivision (f), stating that mother was not submitting on the department's report and recommendation,

but rather on the juvenile court's discretion to decide whether to find jurisdiction for the subdivision (f) count. Counsel noted that mother acknowledged the baby's initial injuries from the drowning caused him to be in a fragile state.

With respect to the bypass of services, mother's counsel asked the juvenile court, if it found jurisdiction, to find mother should be given reunification services pursuant to section 361.5, subdivision (c)(2), since providing services would be in the children's best interests. Counsel noted mother had participated faithfully and completely in the services the department provided and had tested clean since August. Counsel asserted mother's testimony showed mother was very genuine, she took responsibility for what happened, and with ongoing counseling she would get a lot better. Counsel acknowledged the case involved the death of a child, but argued the court should consider that this was an isolated incident that was not deliberate. Counsel asserted the children had a clear bond with mother and mother was willing and able to provide the children with stability.

The children's attorney asked the juvenile court to find the subdivision (f) count true and believed the court should find it was in the children's best interests to offer mother reunification services. The attorney argued the department had not given mother credit for what she had done in this case and for her current fitness; mother had been participating in every court-ordered service, and she was doing well. While the children were young, mother was participating in services and the baby's death was accidental.

On March 25, 2024, the juvenile court found the department demonstrated by clear and convincing evidence that the section 300, subdivision (f) count was true and the children were described by that subdivision. Regarding disposition, the juvenile court found section 361.5, subdivision (b)(4) applied to mother, as the court found the subdivision (f) count true by clear and convincing evidence.

The juvenile court turned to whether it could find by clear and convincing evidence that reunification was in the children's best interests. The court assessed the factors set forth in *In re Ethan N.* (2004) 122 Cal.App.4th 55 (*Ethan N.*). The court was

13.

extremely concerned that mother told the psychologist a completely different version of what led to the baby's drowning.  The court found the social worker and the social worker supervisor to be credible, while it found mother credible on some issues but not others.  The court found the "gravity" of the problem was mother's failure to pay attention to the children or acknowledge what happened that day, and that mother did not understand the overarching need to provide the children with safe and secure circumstances.  The court stated that having considered each of the *Ethan N.* factors and the evidence before the court, it could not find by clear and convincing evidence that reunification was in the children's best interests.  Therefore, as to daughter, the juvenile court found reunification services were not to be provided to mother under section 361.5, subdivision (b)(4), and set a section 366.26 hearing for July 23, 2024.

## DISCUSSION

Mother does not challenge the juvenile court's findings of jurisdiction under section 300, subdivision (f), or that section 361.5, subdivision (b)(4) applied.  Instead, mother contends she carried her burden below of proving by clear and convincing evidence that offering reunification was in daughter's best interest.  Mother asks us to direct the juvenile court to vacate the section 366.26 hearing, find that section 361.5, subdivision (c)(2) was proven by clear and convincing evidence, and remand for new orders to provide her with reunification services.

*Applicable Law and Standard of Review*

Section 361.5, subdivision (a) sets forth the general rule that a parent whose child has been removed in a dependency proceeding must be provided reunification services.  There are, however, exceptions listed in subdivision (b) of section 361.5 that allow the juvenile court to deny reunification services.  The court here found that section 361.5, subdivision (b)(4) applied to mother, which provides in relevant part:  "(b) Reunification services need not be provided to a parent … described in this subdivision when the court finds, by clear and convincing evidence, .…  [¶]  …  [¶]  (4) That the parent … of the

14.

child has caused the death of another child through abuse or neglect." Mother does not challenge this finding.

When any of the section 361.5, subdivision (b) exceptions apply, "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) As this court recognized in *Ethan N.*, *supra*, 122 Cal.App.4th 55, "when child abuse results in the death of a child, such abuse 'is simply too shocking to ignore' in determining whether the offending parent should be offered services aimed at reunification with a surviving child. 'The fact of a death and a subsequent petition … arising out of that death simply obliterates any possibility of reunification .…' " (*Id.* at p. 65, fn. omitted.)

Nevertheless, the Legislature has left open a " 'tiny crack' " to parents who have been responsible for the death of a child through abuse or neglect. (*Ethan N.*, *supra*, 122 Cal.App.4th at p. 65.) Subdivision (b)(4) of section 361.5 may be overcome if "the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) In determining whether reunification would serve the child's best interest, particularly when the parent has been found to have caused the death of a child through abuse or neglect, courts may consider the following four factors: (1) the "parent's current efforts and fitness as well as the parent's history"; (2) the gravity of the problem that led to the dependency; (3) the strength of the relative bonds between the child and the parent and the child and his or her caretakers; and (4) the child's need for stability and continuity. (*Ethan N.*, *supra*, 122 Cal.App.4th at pp. 66–67.) The parent has the burden of showing that reunification with the child—and therefore offering reunification services to the parent—would serve the child's best interest. (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227.) When the party with the burden of proof appeals, contending the trier of fact erred in concluding that party failed to meet his or her burden, the question on appeal "becomes whether the evidence compels a finding

in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) "A juvenile court has broad discretion when determining whether … reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion." (*William B.*, at p. 1229.)

*Analysis*

Mother argues she provided sufficient evidence to support a finding reunification was in daughter's best interest. Mother analyzes each of the *Ethan N.* factors, highlighting the facts tending to favor reunification. She cites to evidence that she was participating in and benefiting from services, the children were bonded to her, and she worked diligently to address the issues that led to the children's removal. She asserts that while "[t]here is no worse case than a case that leads to the death of a child," mother did not intentionally harm the baby and his death was not caused by ongoing, deliberate, serious physical abuse. Rather, she argues, this was an isolated incident of mother making a poor decision to leave the children unattended when they were in the bathtub.

Mother's argument, however, is incongruent with the standard of review. The issue is not whether there is substantial evidence to support a finding that reunification would be in daughter's best interest, but rather whether the evidence compels such a finding. In her statement of the facts and argument, mother completely ignores the evidence that weighs against such a finding. When the evidence is considered together, a finding that reunification was in daughter's best interest was not compelled.

The evidence shows, while mother was participating in services, she had not learned from those services. She continued to minimize her neglectful actions and failed to tell the truth about the incident to protect her boyfriend's adult children. Mother's narrative of what happened the day of the drowning changed and developed depending on who mother was talking to. While the psychologist found mother had the ability to benefit from services and the risk to the children had decreased, the risk remained

moderate to high for the children to have unsupervised contact with her. Although daughter was bonded to mother, she had a close and loving relationship with her care providers and was not distressed when visits with mother ended.

Mother asserts the drowning was an isolated incident where she made one poor decision.[6] The problem here, however, is more than an isolated act of negligence, but rather mother's failure to pay attention to the children or acknowledge what happened that day, and her failure to understand the overarching need to provide the children with safety and security. Mother's lack of protective capacity and failure to fully understand how her actions had fatal consequences were particularly concerning, as daughter is not able to protect herself given her young age.

Based on all the evidence, we cannot say the juvenile court was compelled to find that providing mother reunification services was in daughter's best interest or that the court abused its discretion in so ruling. Accordingly, we cannot reverse the court's order and we affirm.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).

---

[6] Mother asserts that in cases such as *Ethan N.* and *In re I.I.* (2019) 42 Cal.App.5th 971, parents received reunification services despite being found responsible for a child's death. While the juvenile court ordered services in *Ethan N.*, we reversed that order after finding substantial evidence did not support the court's finding that reunification would serve the child's best interest and directed termination of services. (*Ethan N.*, *supra*, 122 Cal.App.4th at pp. 68–69.) And in *In re I.I.*, although the juvenile court ordered reunification services, the propriety of that ruling was not an issue before the appellate court. (*I.I.*, at p. 973.) We note that because the decision on whether to provide services in the face of a jurisdictional finding that the parent caused the death of a child through abuse or neglect turns on the evidence before the juvenile court, that parents in other cases were provided services does little to assist us in determining whether the court was required to provide services in this case.